Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Natasha Mehta (SBN 272241)
nmehta@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698

Attorneys for Plaintiffs
RICHARD DECKER WATSON, and
MEGAN RANEY-AARONS, individually,
and on behalf of other members of the
public similarly situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

Case Number:   CV13-05243-ABC (MANx)

| | |
|---|---|
| RICHARD DECKER WATSON and MEGAN RANEY-AARONS, individually, and on behalf of other members of the general public similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> FORD MOTOR COMPANY, a Delaware Corporation, <br><br> Defendant. | **CLASS ACTION COMPLAINT FOR:** <br><br> (1) Violation of the Consumers Legal Remedies Act (Cal. Civ. Code §§ 1750 *et seq.*); <br> (2) Violation of Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); <br> (3) Violation of False Advertising Law (Cal. Bus. & Prof. Code §§ 17500 *et seq.*); <br> (4) Breach of Implied Warranty of Fitness for a Particular Purpose; <br> (5) Breach of Implied Warranty of Merchantability; <br> (6) Breach of Express Warranty; <br> (7) Violation of Magnuson-Moss Warranty Act (15 U.S.C. § 2301); <br> (8) Negligent Misrepresentation; and <br> (9) Unjust Enrichment <br> **Jury Trial Demanded** |

1  Plaintiffs MEGAN RANEY-AARONS and RICHARD DECKER WATSON

2  ("Plaintiffs"), individually and on behalf of all other members of the public similarly

3  situated, allege as follows:

4  **INTRODUCTION**

5      1.     This is a consumer class action concerning the affirmative

6  misrepresentations and intentional nondisclosures made by Defendant Ford Motor

7  Company ("Defendant" or "Ford") concerning its MyFord Touch, MyLincoln Touch,

8  and MyMercury Touch systems (collectively, "MyFord Touch") installed in Defendant's

9  Ford, Lincoln and Mercury vehicles (the "Class Vehicles").

10      2.     Although Ford represents that its MyFord Touch system will provide

11  consumers a host of advanced features, including navigation, audio, phone integration,

12  and safety features, in reality, MyFord Touch suffers from numerous defects that render

13  the system inoperable.

14      3.     Since its launch in January 2010, Ford has utilized a variety of marketing

15  mediums, extolling MyFord Touch as an advanced, innovative high-tech product driving

16  new consumers to the Ford brand.  In connection with its marketing of MyFord Touch,

17  as part of an extensive and long-term advertising campaign, including communications

18  made in television, print, outdoor, and other media, Ford made representations and

19  omissions touting the purported benefits of MyFord Touch and concealing its defects.

20  Consumers, dazzled by Ford's misleading marketing campaign, pay a premium to

21  purchase the Class Vehicles equipped with the purportedly revolutionary MyFord

22  Touch, only to find that the system is so replete with defects it is essentially non-

23  functional.  Moreover, the MyFord Touch system draws consumers to purchase the

24  Class Vehicles over vehicles manufactured by other brands.

25      4.     Ford has issued various updates to MyFord Touch.  Although this has,

26  arguably, created an illusory effect of remedying the problem, not one of these updates

27  has ultimately resolved the defects plaguing MyFord Touch.  Plaintiffs are informed and

28  believe, and based thereon, allege that the system is inherently defective, and incapable

1  of being fixed.

2      5.      Plaintiffs are informed and believe, and based thereon, allege that since its

3  January 2010 launch, Ford has known that in reality it could not deliver the MyFord

4  Touch system it promised.  Ford became aware of the scope of defects shortly after the

5  launch, as consumer complaints poured in and Ford's quality ratings plummeted.  Yet,

6  over three years later, Ford still fails to disclose these defects to consumers, while it

7  simultaneously continues to market, sell and lease the Class Vehicles to consumers,

8  touting the MyFord Touch features it cannot deliver.

9      6.      As a result of Ford's misrepresentations and omissions, owners of the Class

10  Vehicles have suffered, and continue to suffer, losses in money and/or property.

11      7.      Plaintiffs and members of the Class relied upon Ford's material

12  misrepresentations and omissions in purchasing the Class Vehicles.  Had it not been for

13  Ford's affirmative misrepresentations concerning MyFord Touch, and Ford's failure to

14  disclose the defects, Plaintiffs and members of the Class would not have purchased or

15  leased the Class Vehicles, they would have paid substantially less for them, or they

16  would not have paid for the MyFord Touch option.

17      8.      Plaintiffs, individually and on behalf of other members of the Class, hereby

18  bring this action for Ford's statutory and common law violations, including its violation

19  of applicable consumer protection and deceptive trade practice statutes, and Ford's

20  breaches of its warranties to Plaintiffs and members of the Class.

21                          **JURISDICTION AND VENUE**

22      9.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2).  The

23  matter in controversy, exclusive of interest and costs, exceeds the sum or value of

24  $5,000,000 and is a class action in which members of the Class (as defined below) are

25  citizens of states different from Defendant.  Further, greater than two-thirds of the

26  members of the Class reside in states other than the states in which Defendant is a

27  citizen.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental

28  jurisdiction over the state law claims because all of the claims are derived from a

2

common nucleus of operative facts and are such that plaintiffs would ordinarily expect to try them in one judicial proceeding.

10.    Venue lies within this judicial district under 28 U.S.C. § 1391(a) and (c) because Ford has sufficient contacts with this District to subject it to personal jurisdiction in this District, and a substantial part of the events and omissions giving rise to the claims asserted in this Complaint occurred within this District.

## PARTIES

11.    Plaintiff Megan Raney-Aarons is a citizen of the State of California and a resident of Venice, California, which is in Los Angeles County, California.

12.    Plaintiff Richard Decker Watson is a citizen of the State of California and a resident of Los Angeles, California, which is in Los Angeles County, California.

13.    Defendant Ford Motor Company is a Delaware corporation, with its principal place of business located at One American Road, Dearborn, Michigan 48126, and doing business in California.  Defendant Ford Motor Company is one of the world's largest automotive manufacturers and is in the business of designing, manufacturing and distributing vehicles, including the Class Vehicles.

14.    Whenever, in this Complaint, reference is made to any act, deed or conduct of Ford, the allegation means that Ford engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees or representatives who was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Ford.

## FACTUAL BACKGROUND

### Ford's Representations Concerning SYNC and MyFord Touch

15.  Ford first announced the release of its SYNC technology in January 2007, at the Detroit International Auto Show.  SYNC is a factory-installed, integrated in-vehicle communications and entertainment system allowing users to make hands-free telephone calls, control music and perform other functions with the use of voice commands.  SYNC consists of applications and interfaces developed by Ford and other third-party

3

developers, and runs on the Windows Embedded Automotive operating system designed by Microsoft Corporation.

16.   The brain of the SYNC system is the Accessory Protocol Interface Module ("APIM").  The APIM interfaces with all vehicle audio sources, as well as high-speed and medium-speed vehicle Controller Area Network buses.  In addition, SYNC's operating system can also receive software updates through the use of USB ports.

17.   In Ford's press release announcing the launch of SYNC, Bill Gates, chairman of Microsoft Corporation, stated that "Ford and Microsoft share a vision for a future where drivers are safely connected to the people, information and entertainment they care about while they are on the road."  Ford further represented that SYNC was fully upgradeable, such that "Ford owners will never need to worry about whether their car or truck is compatible with the latest phone or music player that hits the market."

18.   SYNC initially promised to deliver an array of complex features that integrated the user's cellular phone, and was initially installed in twelve Ford group vehicles in North America.  Such promised features included, for example:

- Voice-activated, hands-free calling;
- Automatic, uninterrupted connection to a Bluetooth phone upon starting the car;
- Text messages read out loud to the user;
- Access to caller ID, call waiting, conference calling, a list of contacts and other phone features, all available on the display screen; and
- Voice-activated access to music from the user's mobile phone, USB drive or digital media player.

19.   In January 2008, Ford released Ford SYNC v.2, which enabled two new features.  The first, "911 Assist," would automatically place a direct call to a local 911 emergency operator in the event of a serious accident with an air bag deployment, after a 10-second window during which the user could opt out of the call placement.  The second, "Vehicle Health Report," would provide diagnostic, maintenance and recall information

4

for the vehicles.

20.   In April 2009, Ford released Ford SYNC v.3, which provided the "Traffic, Directions and Information" application.  This offered the user turn-by-turn navigation and information concerning weather, sports, and news, among other topics.

21.   On January 7, 2010, Ford announced the release of MyFord Touch at the 2010 International Consumer Electronics Show.  MyFord Touch was to be considered the next generation of SYNC technology.

22.   The launch of MyFord Touch was also promoted by Ford as a significant reason to purchase a Ford vehicle.  At the launch of MyFord Touch, Ford's CEO, Alan Mulally said, referring to MyFord Touch, that "this is a reason to buy Ford . . . It's just a smart design.  We think it's a value proposition."  Ford's Vice President for Group Product Development stated, "[d]emocratization of technology is a key aspect of our product plan . . . With [MyFord Touch], we didn't want to create an upscale electronics package and just put it on our  highest-end vehicles: From our affordable small cars to the ultimate Lincoln, we're going to make a premium, appealing and intuitive experience available to everyone."  Thus, MyFord Touch would be available on Lincoln and Mercury vehicles as well, branded as MyLincoln Touch and MyMercury Touch, respectively.

23.   MyFord Touch consists of two driver-configurable 4.2 inch color LCD displays in the gauge cluster, one 8 inch color LCD touch screen in the center stack, a media hub with two USB ports, an SD card reader, RCA video input jacks and 5-way controls on steering wheels, and a voice activated communications and entertainment system.

24.   MyFord Touch promised drivers to seamlessly integrate nearly all mobile phones, PDAs and digital media players into their cars.  Operation of these devices would be performed using voice commands, touch-screen inputs, the vehicle's steering wheel, radio controls, Bluetooth and Wi-Fi connectivity.  Furthermore, Ford promised that by employing an advanced media hub, users would be able to easily upgrade MyFord Touch without requiring new hardware.

5

25. Ford continued to tout the safety features of this next generation of SYNC technology. In a press release, Jason Johnson, Ford's user interface design engineer stated, "[d]riving is the priority when you're behind the wheel, so we've made it possible to simplify the content management so customers can drive with minimal distraction."

26. Ford's promised features for MyFord Touch, found in Ford's January 7, 2010 press release, is listed below:

| Media Hub | • Additional USB port for a total of two USB 2.0 inputs<br>• SD Card slot<br>• RCA A/V input jacks |
|---|---|
| Internet Connectivity | • Full WiFi capability including Internet "hot spot" connectivity and a built-in browser for use while in "Park" (late availability)<br>• Integrated browser supports tabbed page navigation, "drag" to pan and scroll and a provides a 3-D carousel for bookmark browsing<br>• Support for on-screen and USB-connected keyboards<br>• RSS feed aggregator and text-to-voice reader<br>• Mobile in-car WiFi "hot spot" capability through USB-installed air card or USB mobile broadband modem |
| Phone | • Phone book contact photo download and 3-D carousel browsing<br>• Birthday reminders<br>• Enhanced error correction and reporting |
| Voice Recognition | • Direct speech commands and "flattened structure" for quicker, more responsive voice control<br>• Voice-command activation of selected climate control functions<br>Voice commands will be available for most radio functions, including AM/FM, HD Radio$^{TM}$ Technology and SIRIUS/XM$^®$ Satellite Radio<br>• SIRIUS Game Finder application will facilitate automatic voice tuning for desired sporting events using commands such as "Tune to Detroit Lions game" or "Show NFL games" |
| Navigation | • Improved visual presentation of SYNC Traffic, Directions & Information app adds directional arrows, street names and distance markers<br>• Map-based navigation app provided by TeleNav via an optional SD Card<br>• SD Card navigation includes SIRIUS Travel Link$^{TM}$ services such as weather maps, movie listings, gas prices, and sports scores<br>• SD Card navigation also adds cities point-of-interest information including ratings and amenities<br>• Map data includes 3-D visual landmarks |
| Climate Control | • MyTemp personalization allows the driver to store a preferred temperature, which is then accessible with a single touch of the MyTemp button<br>• Different MyTemp settings can be programmed to different keys; multiple drivers in a household can each have unique MyTemp settings |
| Audio | • AM/FM/CD, SIRIUS Satellite Radio, USB-connected MP3 players and memory sticks<br>• New HD Radio capability<br>• Song tagging capability via HD Radio Technology, allowing listeners to identify song information and store it for later use<br>• Browse tracks by artist, scan lists of tracks with identical names, and browse through devices without having to change audio sources |

6

|  | |
|---|---|
|  | • 3-D carousel album cover art and photo viewing displays allow easy scanning of available material, especially combined with Gracenote Media Management<br>• Media player equipped with new "Podcast" source category<br>• Enhanced Bluetooth® audio support including metadata, which allows additional command and control functions for capable mobile devices |
| Vehicle Setting Personalization | • Ambient lighting color control using a 3-D carousel browser<br>• Custom welcome messages<br>• Saved and transferrable user profiles that can be ported between Ford vehicles equipped with MyFord<br>• Door keypad code control using on-screen menus<br>• Where available, Active Park Assist and Rear View Camera displays<br>• Image and video uploading via SD card slot or USB 2.0 ports |
| SYNC Apps & Services | • Traffic, Directions & Information offers personalized traffic reports and routing from INRIX, turn-by-turn directions, business search, sports, news and weather via SYNC and the user's mobile phone<br>• Downloadable destinations when coupled with the SD card navigation function; SYNC Service Delivery Network (SDN) will be able to send a destination directly to the vehicle<br>• Vehicle Health Reports will download service reminders and vehicle information directly to the in-car displays<br>• Improved 911 Assist™ capability with GPS location can call for help in the event of an air bag deployment |

27.   Plaintiffs are informed and believe, and on that basis, allege that as a stand-alone option, Ford's suggested retail price for MyFord Touch is $1,000.

28.   Ford actively touts MyFord Touch through a variety of mediums, including its website. MyFord Touch's safety components are critical since they play a vital role in, *inter alia*, proper operation of the Class Vehicles' back-up camera, 911 assist, hands-free calling, the vehicle health report, and adaptive cruise control. On its website, Ford emphasizes the safety features of SYNC by claiming, among other things, that:

- "SYNC helps you keep your eyes on the road and stay connected to your world;"

- "SYNC lets you use your phone, browse and choose music and find your way to just about anywhere -- all while keeping your eyes on the road and hands on the wheel;"

- "If an airbag deploys, SYNC can call 911 and report your location, even if you can't. It's added peace of mind whenever you're behind the wheel," and;

- "SYNC saved my life."

7

29.   Additionally, MyFord Touch provides the interface for Ford's Operator Assist feature, which provides the ability for drivers who subscribe to Sync Services (at a cost of approximately $200/year) to find a business or get turn-by-turn directions using voice commands (similar to OnStar).

**Defects Arising in the Ford SYNC and MyFord Touch Systems**

30.   Shortly after the launch of MyFord Touch, consumers began to report numerous defects and problems concerning the system (collectively, the "MyFord Touch/SYNC Defects").  Such defects were and are, at the minimum, annoying and distracting, and at worst, render the Class Vehicles unsafe to drive.  Among numerous other defects, consumers reported that:

- The touch screen went suddenly blank and MyFord Touch would automatically reboot, with several minutes of delay, while the vehicle was in motion;
- MyFord Touch would freeze;
- The touch screen did not respond to owners' touch;
- The MyFord Touch did not understand the user's voice commands;
- The navigation system was inoperable, did not understand the driver's location, or provided incorrect directions;
- The backup camera suddenly shut down while backing up the vehicle;
- The heating and defrosting functions were inoperable;
- The music playing would stop, change volume or track;
- Windshield wipers would stop working;
- Cruise control would shut off;
- Dashboard lights flickered on and off;
- Phone calls were dropped;
- Cell phone reception was poor.

31.   Many of these defects pose serious and obvious safety concerns for drivers and occupants of the Vehicles, placing them at greater risk of collisions.  For example:

8

- When MyFord Touch completely shuts down and reboots while the car is in motion, drivers are forced to focus on the malfunction while driving, or they become seriously distracted, their attention drawn away from the road;

- Delays in the touch screen responding to a driver's touch draw the driver's eyes to the touch screen and away from the road, also increasing the risk of a collision;

- The sudden inability to defrost windshields and operate windshield wipers impairs the driver's view of surrounding traffic;

- The sudden malfunctioning of cruise control potentially leads to accidents;

- The sudden shutdown of the backup camera while the vehicle is in reverse potentially leads to collisions with persons or objects behind the vehicle; and

- The inability to dial 9-1-1 in emergencies, a feature MyFord Touch promises to provide, also places the Class Vehicles' occupants in danger.

32.   Plaintiffs are informed and believe, and on that basis allege, that as a result of the numerous serious defects found in MyFord Touch, and the sheer volume of consumer complaints regarding this system, J.D. Power & Associates' 2011 Initial Quality Study ranked Ford very poorly.  Ford plunged from the fifth position in 2010 to the twenty-third in this study, while Ford's Lincoln vehicles fell from the eighth position in 2010 to the seventeenth.  Indeed, David Sargent, vice president of global vehicle research at J.D. Power & Associates, stated that the defects found in MyFord Touch were the primary driver in this dramatic drop in ratings.

33.   Ford knew or should have known, at the time that it began to advertise, sell and lease the Class Vehicles that My Ford Touch contained serious latent design, manufacturing and/or assembly defects that caused MyFord Touch to persistently

9

1  malfunction.  Plaintiffs are informed and believe, and on that basis, allege that MyFord

2  Touch is defective and not fit for its intended purposes – that is, to provide navigation,

3  audio, and phone features, among the other promised features described above.

**Ford Is Well Aware of the MyFord Touch/SYNC Defects**

5  34.    The MyFord Touch/SYNC Defects, and Ford's response thereto, have been

6  well documented.  Ford's consumer deception is both knowing and willful.  Although

7  Ford is well aware of the MyFord Touch/SYNC Defects and the significant scope of the

8  problem, Ford has continued to make affirmative misrepresentations touting MyFord

9  Touch's features, and has failed to disclose the MyFord Touch/SYNC Defects to

10  consumers.

11  35.    Ford has issued a number of Technical Service Bulletins ("TSBs"),

12  warranty extensions, and upgrades reflecting its awareness of the SYNC defects, and its

13  unsuccessful attempts to resolve the issues.  At all times, Ford has possessed vastly

14  superior information to that of consumers about the MyFord Touch/SYNC Defects.

15  However, despite Ford's knowledge of the MyFord Touch/SYNC Defects, Ford failed to

16  disclose, and concealed, the MyFord Touch/SYNC Defects to consumers.  Plaintiffs are

17  informed and believe, and on that basis, allege that Ford undertook some of these

18  efforts, in whole or in part, in order to create the illusion that the MyFord Touch/SYNC

19  Defects could be easily resolved, and to actively conceal the issue, although Ford was

20  aware that there was no way to fix the inherently defective system.

21  36.    Furthermore, Ford continued to market and sell MyFord Touch, making

22  affirmative misrepresentations about the features MyFord Touch offers to consumers,

23  and touting its benefits and safety features on the Ford website and through other

24  marketing materials.  Thus, Ford has willfully intended that consumers rely on its

25  statements concerning MyFord Touch in purchasing the Class Vehicles, and has

26  attempted to mask the MyFord Touch/SYNC Defects.

27  37.    On or around January 28, 2010, Ford issued TSB 10-2-8, informing

28  technicians that "[s]ome customers of 2008-2010 SYNC-equipped vehicles may express

concern with their SYNC paired device defaulting, switching or staying on privacy mode. The customer may not be able to accept the call through the SYNC system or must answer the call manually on their personal device." Ford instructed technicians to set the privacy mode to off on the device, then recheck SYNC operation. This TSB applied to a number of 2008-2010 Ford, Lincoln and Mercury Class Vehicles.

38.    On or around July 6, 2010, Ford issued TSB 10-13-4, informing technicians that "Some 2010 vehicle[s] in the US market equipped with SYNC non-navigation – traffic, directions, information and built on or before 6/14/2010 may exhibit no turn-by-turn directions and/or unable to pin point vehicle location." Ford instructed technicians to reprogram the Global Positioning System Module. This TSB applied to a number of 2010 Ford, Lincoln and Mercury Class Vehicles.

39.    On or around March 6, 2012, Ford issued Customer Satisfaction Program Campaign 12M01 ("CSP 12M01"). Plaintiff is informed and believes, and on this basis, alleges that CSP 12M01 informed all U.S. Ford and Lincoln dealers that a number of Class Vehicles equipped with MyFord Touch may require replacement of the APIM. Therefore, Plaintiff is informed and believes, and on this basis, alleges that CSP 12M01 extended warranty coverage of the APIM to four years of service from the warranty start date on Ford vehicles, and five years on Lincoln vehicles, regardless of mileage.

40.    On or around March 13, 2012, Ford issued TSB 12-3-11, informing technicians that "[s]ome 2012 Edge, MKX and Explorer vehicles built 10/30/2011 through 12/31/2011, equipped with optional clusters and MyFord Touch or MyLincoln Touch, may exhibit multifunction and infotainment display screens simultaneously going blank, scrambled images, flickering displays. These conditions will occur on both screens at the same time." Ford instructed technicians to reprogram the instrument panel cluster for these Class Vehicles.

41.    On or around September 1, 2012, Ford issued TSB 12-9-1, instructing technicians that "[s]ome 2011-2013 Edge/MKX, Explore and 2013 Flex/MKT, Taurus/MKS vehicles equipped with MyFord Touch and MyLincoln Touch may exhibit

11

1  concerns with Missing Radio Presets, Radio Stays On, Voice Recognition Inoperative,

2  and Sirius Missing Fuel Prices." Ford instructed technicians to use a USB flash drive to

3  update the consumer interface processor.

4       42.   On or around November 8, 2012, Ford issued DEMONSTRATION /

5  DELIVERY HOLD – Application Performance Upgrade 11A01 ("APU 11A01") to all

6  U.S. Ford and Lincoln Dealers. APU 11A01 instructed dealers that a number of Class

7  Vehicles equipped with MyFord Touch®, including 2011 Explorers, 2011-2012 Edges,

8  2011-2012 MKXs, and 2012 Focuses, would require upgraded software "to improve

9  overall system functionality, voice recognition, screen refresh rates, response to touch,

10  and to simplify screens." Thus, dealers were required to perform a "full image

11  reprogram of the APIM," insert a new Navigation SD card, and insert a new updated

12  user guide into users' glove compartments.

13       43.   On or around January 14, 2013, Ford issued Customer Satisfaction

14  Program 12M02 ("CSP 12M02") to all U.S. Ford and Lincoln dealers. CSP 12M02 was

15  intended to supersede CSP 12M01, and applied to a number of Class Vehicles equipped

16  with SYNC, including 2011-2013 Edges, 2011-2013 Explorers, 2011-2013 MKXs,

17  2012-2013 Focuses, 2013 Escape, 2013 Flex, 2013 Fusion, 2013 Taurus, 2013 MKS,

18  2013 MKT, 2013 MKZ, 2013 F-150, and 2013 F-SuperDuty. CSP 12M02 instructed all

19  U.S. Ford and Lincoln Dealers that the above vehicles may require full replacement of

20  the APIM, and that warranty coverage would be extended to five years of service from

21  the warranty start date for Ford vehicles, and six years for Lincoln vehicles, regardless

22  of mileage.

23       44.   On May 2, 2013, Ford issued a supplement to APU 11A01 ("APU 11A01

24  Supplement"), extending the program expiration date from May 1, 2013 to February 1,

25  2014.

26       45.   In addition, numerous consumers have filed complaints with the National

27  Highway Traffic Safety Administration concerning the MyFord Touch/SYNC Defects.

28  A small sample of such complaints follows:

12

Date Complaint Filed: 08/02/2011

Component(s): ELECTRICAL SYSTEM , EQUIPMENT

Date of Incident: 03/29/2011

NHTSA ID Number: 10416771

All Products Associated with this Complaint:

Vehicle Make: FORD

Model: EDGE

Year: 2011

Crash: No       Fire: No       Number of Injuries: 0       Number of Deaths: 0

Manufacturer: Ford Motor Company

Vehicle Identification No. (VIN): 2FMDK3KC2BB

SUMMARY: VARIOUS PROBLEMS WITH SYNC/COMPUTER SCREEN IN CAR - SIDE WARNING CAR COMING LIGHTS GO ON FOR NO REASON , SCREEN GOES DARK AND BLACK BOX APPEARS IN CENTER INCLUDING WHEN IN REVERSE THUS BLANKING OUT CENTER VISUAL FIELD OF BACK UP CAMERA (SEE CAMERON GULBRANSEN TRANSPORTATION SAFETY ACT FEB 2008). ALL THIS BEGAN AFTER FORD RECALL PROGRAM 10B20 DONE MARCH 29, 2011. IT WORKED PERFECTLY PRIOR TO THAT TIME. CAR WAS BROUGHT BACK TO DEALER AP 2, AP 21, AP 27, MAY 5-9 AND AUG 2 2011 FOR SAME ISSUES. COMPUTER WORKS FOR SHORT TIME THEN PROBLEMS START AGAIN. I DO HAVE A PHOTO IN MY PHONE OF THE BLACK SCREEN HAPPENING WHICH WAS SHOWN TO THE DEALER. IT IS OFTEN TOO UNSAFE TO DRIVE AND TAKE A PHOTO AT THE SAME TIME TO COLLECT BETTER EVIDENCE OF EPISODES SO I ONLY HAVE A COUPLE OF PHOTOS THAT CAME OUT CLEARLY. ALSO VARIOUS OTHER PROBLEMS-PHONE SUDDENLY UNSYNCS ITSELF WHILE DRIVING - I MADE A CALL THEN TRIED TO MAKE A SECOND CALL A FEW MOMENTS LATER AND IT HAD DISCONNECTED FROM CAR INCLUDING ALL 911 SERVICE. WHILE DRIVING ON ROAD WITH NO OTHER CARS NOR OBJECTS, SUDDENLY BEGAN RINGING ALARM AND FLASHING THAT CARS WERE COMING FROM THE SIDES AND THERE WAS NO ONE ON EITHER SIDE AND NO WIND NOR RAIN. WHILE AT DEALER PAST 3 TIMES, DETROIT HOME OFFICE WAS CALLED BY THE DEALER FOR FURTHER ADVICE BY DEALER. *KB

Date Complaint Filed: 08/30/2011

Component(s): ELECTRICAL SYSTEM
Date of Incident: 05/05/2011

NHTSA ID Number: 10422679

All Products Associated with this Complaint:

Vehicle Make: LINCOLN

Model: MKX

Year: 2011

Crash: No      Fire: No      Number of Injuries: 0      Number of Deaths: 0

Manufacturer: Ford Motor Company

Vehicle Identification No. (VIN): 2LMDJ8JK1BB

SUMMARY: TL* THE CONTACT OWNS A 2011 LINCOLN MKX. THE CONTACT STATED
THAT THE VEHICLE SYNC PROGRAM WAS DEFECTIVE. THE CONTACT MENTIONED THAT
ONCE THE FAILURE OCCURRED THE NAVIGATION SYSTEM, TEMPERATURE GAUGES
AND REARVIEW CAMERA WOULD SPORADICALLY FAIL OR ACTIVATE WITHOUT
WARNINGS. IN ADDITION, THE CONTACT STATED THAT THE SYSTEM WOULD NOT
RECOGNIZE THE KEY FOB AND THE VEHICLE WOULD NOT TURN START. THE VEHICLE
WAS TAKEN TO THE DEALER WHO DIAGNOSED THAT THE SYNC PROGRAM WAS
DEFECTIVE BUT THEY WERE UNABLE TO COME UP WITH A FEASIBLE REMEDY. THE
MANUFACTURER WAS MADE AWARE OF THE FAILURE WHO DID NOT OFFER ANY
ASSISTANCE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 15 AND
THE CURRENT MILEAGE WAS 2,000. UPDATED 9/27/11 *CN THE LOW PRESSURE OIL LIGHT
ILLUMINATED AND THE SYNC SYSTEM LOCKED UP. THE CONSUMER STATED THE
PROBLEM HAPPENED SPORADICALLY. UPDATED 10/07/11

Date Complaint Filed: 12/09/2011

Component(s): ELECTRICAL SYSTEM , VISIBILITY

Date of Incident: 12/08/2011

NHTSA ID Number: 10439143

Vehicle Make: FORD

Model: EDGE

Year: 2012
Crash: No      Fire: No       Number of Injuries: 0      Number of Deaths: 0

Manufacturer: Ford Motor Company

Vehicle Identification No. (VIN): 2FMDK4JC9CB

SUMMARY: VEHICLE EQUIPPED WITH MYFORD TOUCH SYSTEM. SYSTEM CONTROLS HEATING/DEFROSTING SYSTEM. THIS SYSTEM HAS FAILED TO OPERATE PROPERLY ON MULTIPLE OCCASIONS. FORD MOTOR COMPANY IS AWARE OF ISSUE AND HAS NOT CORRECTED IT. FORD SHOULD NOT BE ALLOWED TO MARKET VEHICLES THAT DO NOT HAVE PROPERLY FUNCTIONING HEATING/DEFROSTING CONTROLS. THESE VEHICLES ARE DANGEROUS AND THE ISSUE IS WELL KNOW BY INTERNET SEARCHES. PEOPLE RELY ON VEHICLES TO OPERATE PROPERLY IN WINTER CONDITIONS. THIS NEEDS TO BE ADDRESSED. THANK YOU FOR YOUR HELP. *TR

1   Date Complaint Filed: 12/20/2011

2   Component(s): ELECTRICAL SYSTEM , EQUIPMENT

3   Date of Incident: 07/03/2011

4   NHTSA ID Number: 10440554

5   Vehicle Make: FORD

6   Model: EDGE

7   Year: 2011

8   Crash: No      Fire: No        Number of Injuries: 0         Number of Deaths: 0

9

10  Manufacturer: Ford Motor Company

11  Vehicle Identification No. (VIN): 2FMDK3KC7BB

12  SUMMARY: THE NAVIGATION IS PROBABLY THE MOST USER UNFRIENDLY UNIT WE
13  HAVE EVER USED AND HAVE WRITTEN THREE TIMES TO CORRECT THE BAD
    INFORMATION IN IT; I.E. TAKES YOU TO THE WRONG LOCATION. A NAVIGATIONAL
14  SYSTEM THAT CANNOT BE TRUSTED IS WORSE THAN NOT HAVING ONE AT ALL. THERE
    ARE MANY PROBLEMS WITH THIS NAVIGATION SYSTEM IN ADDITION TO THE OTHER
15  œSENSOR SAFETY GOODIES ON THIS VEHICLE. THE BLISS IS A SAFETY HAZARD;
16  WORTHLESS. MY SYNC SYSTEM KEEPS BLANKING OUT (REFERRED TO BY EVERYONE
    AS THE œBLACK SCREEN) OR A SCREEN THAT LOCKS UP AND WILL NOT PERFORM
17  ANY FUNCTION WHATSOEVER. WHEN RESEARCHING THIS VEHICLE I FOUND
    INFORMATION ON THIS PROBLEM AS EARLY AS 2008. I PRINTED ALL THE INFORMATION
18  TO SHOW THE SALESMAN. I HANDED HIM 40 PAGES OF INFORMATION ON THE ~BLACK
    SCREEN AND ASKED IF THIS IS STILL A PROBLEM HE SAID NO. WE PURCHASED THE
19  2011 FORD EDGE LIMITED WITH ALL THE GOODIES. NOW AND SINCE THE LAST ROUND
20  WE EXPERIENCED THE œLOCKED SCREEN AGAIN WHICH REQUIRED ANOTHER TRIP TO
    OUR FORD DEALER. BY THE WAY WE RECEIVED NO PAPER WORK ON THE REPAIR. WE
21  HAVE OVER 15K MILES ON THE VEHICLE NOW AND HAVE HAD EXPERIENCED THIS
    PROBLEM NUMEROUS TIMES. THE NAVIGATION AND THE BLISS SYSTEMS ARE NOT
22  ONLY WORTHLESS BUT SAFETY HAZARDS. A $42,000 MISTAKE?? SHAME ON FORD FOR
23  CONTINUING ON SELLING THIS PRODUCT AND OUR GOVERNMENT FOR LETTING THEM
    DO SO - EVER WONDER WHY THE CONSUMER LOST THEIR FAITH??? FORD - REALLY?
24  *TR

25

26

27

28

16

Date Complaint Filed: 02/22/2012

Component(s): ELECTRICAL SYSTEM

Date of Incident: 01/26/2012

NHTSA ID Number: 10448892

Vehicle Make: FORD

Model: EDGE

Year: 2011

Crash: No      Fire: No      Number of Injuries: 0      Number of Deaths: 0

Manufacturer: Ford Motor Company

Vehicle Identification No. (VIN): Not Available

SUMMARY: TL* THE CONTACT OWNS A 2011 FORD EDGE. THE CONTACT STATED THE
VEHICLE WAS EQUIPPED WITH A SYNC SYSTEM WHICH CONTROLLED THE SATELLITE
RADIO, GPS NAVIGATION, TOUCH SCREEN FEATURE AND OTHER FUNCTIONS. WHILE
DRIVING VARIOUS SPEEDS THE SATELLITE RADIO, GPS NAVIGATION AND TOUCH
SCREEN FEATURE WOULD NOT OPERATE. THERE WERE ALSO OTHER FUNCTIONS
WHICH WOULD NOT OPERATE WITHIN THE SYNC SYSTEM. THE FAILURES WERE
SPORADIC AND A DISTRACTION WHEN DRIVING. THE VOICE COMMAND WOULD
CONTINUOUSLY ACTIVATE WHENEVER THE VEHICLE WAS IN OPERATION WHICH
BECAME ANNOYING. THERE WAS A RECALL RELATED TO THE DEFECT UNDER NHTSA
CAMPAIGN ID NUMBER 11V128000 (ELECTRICAL SYSTEM: SOFTWARE). THE DEALER
STATED THE PART WAS NOT CURRENTLY BEING PRODUCED AND THEY WERE UNABLE
TO PROVIDE ANY ADDITIONAL INFORMATION REGARDING THE ARRIVAL DATE FOR
THE RECALL PART. THE TECHNICIAN ADVISED THE CONTACT TO DISCONNECT THE
BATTERY WHENEVER A FAILURE OCCURRED WITHIN THE SYNC SYSTEM AND THEN
RECONNECT AFTER WAITING FIVE MINUTES. THE VEHICLE WAS BEEN TAKEN TO AN
AUTHORIZED DEALER THREE TIMES FOR THE SIMILAR DEFECT. THE MANUFACTURER
WAS NOT NOTIFIED OF THE PROBLEM. THE CONTACT EXPRESSED CONCERN OF A
POTENTIAL SAFETY HAZARD. THE APPROXIMATE FAILURE MILEAGE WAS 28,000. THE
VIN WAS UNAVAILABLE.

CLASS ACTION COMPLAINT

Date Complaint Filed: 02/25/2012

Component(s): ELECTRICAL SYSTEM

Date of Incident: 12/05/2011

NHTSA ID Number: 10449336

Vehicle Make: FORD

Model: EDGE

Year:

Crash: No     Fire: No     Number of Injuries: 0     Number of Deaths: 0

Manufacturer: Ford Motor Company

Vehicle Identification No. (VIN): 2FMDK4KC5BB

SUMMARY: PURCHASED MY 2011 EDGE LIMITED DEC. 2010, HAD INTERMITTENT SYNC
PROBLEMS STARTING APPROX JUNE 2011. DID AN UPGRADE OFF THE SYNC MY RIDE
WEBSITE IN NOV 2011 AND THAT STARTED ALL THE SYNC PROBLEMS. THEY INCLUDE:
NAVIGATION FAILURE WHILE ON A TRIP, THAT WAS FUN, BEING LOST WITH 2 CARS OF
FAMILY FOLLOWING US. BACKUP CAMERA WORKS OR NOT, DEPENDS ON THE DAY.
DASHBOARD LIGHTS BLINKING ON & OFF WHILE DRIVING, BLUETOOTH
DISCONNECTING MY PHONE ALMOST EVERYDAY. THE SYNC SYSTEM LIKES TO TURN
OFF, BLACK SCREEN, RESETS ITSELF WITHOUT DOING ANYTHING EXCEPT TURNING
THE CAR ON! SOMETIMES WHEN I LEAVE THE CAR THE SYNC SYSTEM & RADIO WILL
STAY ON EVEN AFTER I LOCK THE CAR. 2X IT HAS GONE TO THE DEALER, 2X I GET THE
CAR BACK & AM TOLD I HAVE TO DEAL WITH IT AS THERE IS NO FIX TO THE GLITCH IN
THE SYSTEM. SO, 42K FOR A NEW CAR, ALSO PURCHASED AN EXTENDED WARRANTY,
WHEN ALL WARRANTY'S ARE EXPIRED WHO WILL PAY FOR FORDS "GLITCH"? I WILL
NEVER RECOMMEND THIS CAR TO ANYONE. *TR

Date Complaint Filed: 03/08/2012

Component(s): ELECTRICAL SYSTEM

Date of Incident: 02/27/2012

NHTSA ID Number: 10450754

Vehicle Make: FORD

Model: EDGE

Year: 2011

Crash: No      Fire: No      Number of Injuries: 0      Number of Deaths: 0

Manufacturer: Ford Motor Company

Vehicle Identification No. (VIN): Not Available

SUMMARY: I PURCHASED A NEW FORD 2011 FORD EDGE IN JULY OF 2010 AND WAS
EXTREMELY PLEASED WITH THE PERFORMANCE OF THE CAR AND THE SYNC SYSTEM.
AS THE END OF THE YEAR NEARED, THE SYNC SYSTEM STARTED ACTING VERY
ERRATIC, BLUETOOTH DISCONNECTING, NAVIGATION SD CARD FAILURE, MAPS
EXTREMELY SLOW TO LOAD AND WHEN THE CAR WAS SHUTOFF THE SYNC DID NOT
POWER DOWN. ON THEN NEXT POWER UP, IT WOULD DISABLE BLUETOOTH AND NOT
ALLOW NAVIGATION SYSTEM TO LOAD. THERE WAS A NEW SOFTWARE UPDATE
AVAILABLE FEB 2012 THAT ACCORDING TO THE DESCRIPTION WOULD SOLVE ALL
THESE ISSUES. AFTER FINALLY GETTING IT TO LOAD ON A USB STICK FROM THE SYNC
SITE AFTER MULTIPLE TRIES, I GOT IT DONE. ALSO CONTACTED FOR SYNC SERVICE
AND THEY SAID THERE ARE KNOWN ISSUES WITH THE DOWNLOAD FROM THE SYNC
SITE. SOFTWARE WAS LOADED SUCESSFULLY IN THE CAR AND ALAS, IT SEEMED ALL
MY PROBLEMS WERE CURED....FOR ABOUT 2 DAYS AND NOW THE NAVIGATION SYSTEM
CONTINUES TO TRY LOADING AND THEN DISPLAYS SD CARD FAULT, REALLY HANDY
WHEN YOU USE THIS FOR WORK. I'VE BEEN IN CONTACT WITH FORD AND THEY ADMIT
THERE IS A SOFTWARE BUG IN THE LAST RELEASE...WORKING FOR AN ELECTRONICS
COMPANY, I WOULD SAY THERE WASN'T MUCH VALIDATION DONE. THEY SAID IT
WOULD BE A MONTH BEFORE A FIX IS IN PLACE AND WILL MAIL EVERYONE NEW SD
CARDS. WHAT A JOKE! MAYBE FORD SHOULD CALL APPLE INSTEAD OF MICROSOFT.
*TR

1  Date Complaint Filed: 08/09/2012

2  Component(s): ELECTRICAL SYSTEM

3  Date of Incident: 08/26/2011

4  NHTSA ID Number: 10469990

5  Vehicle Make: FORD

6  Model: EXPLORER

7  Year: 2011

8

9  Crash: No      Fire: No      Number of Injuries: 0      Number of Deaths: 0

10  Manufacturer: Ford Motor Company

11  Vehicle Identification No. (VIN): 1FMHK7D81BG

12  SUMMARY: FORD "MYFORDTOUCH" SYSTEM HAS FAILED ON NUMEROUS OCCASIONS.
13  IT HAS FROZEN, LOCKED UP, AND CONTINUOUSLY REBOOTED. WHEN THIS OCCURS,
    YOU LOSE ALL FUNCTIONALITY AND ABILITY TO CHANGE RADIO STATIONS, ADJUST
14  CLIMATE CONTROL, USE NAVIGATION, HANDS FREE FUNCTIONS, ETC. WHILE THERE IS
    SOME MANUAL CONTROLS FOR BASIC OPERATIONS, IT DOES NOT ALLOW FULL
15  CONTROL OF TALL SYSTEMS. FOR INSTANCE, WHEN THE MFT SYSTEM FAILS, YOU
16  HAVE NO ABILITY TO TURN ON OR ADJUST THE REAR CLIMATE CONTROLS FOR REAR
    PASSENGERS. DEALER HAS TRIED UPGRADING SOFTWARE, RESETTING SOFTWARE,
17  REINSTALLING SOFTWARE, AND REPLACING HARDWARE. WHILE THE PROBLEM IS NOT
    AS BAD AS IT HAS BEEN, IT CONTINUES WITH NO RESOLVE. *TR
18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

Date Complaint Filed: 08/16/2012

Component(s): ELECTRICAL SYSTEM

Date of Incident: 01/27/2011

NHTSA ID Number: 10470900

Vehicle Make: FORD

Model: EDGE

Year: 2011

Crash: No     Fire: No     Number of Injuries: 0     Number of Deaths: 0

Manufacturer: Ford Motor Company

Vehicle Identification No. (VIN): 2FMDK3KC5BB

SUMMARY: I PURCHASED MY 2011 FORD EDGE IN DECEMBER OF 2010 AND HAVE NOT
HAD A DAY WHEN THERE HASN'T BEEN A PROBLEM WITH WITH EITHER THE SYNC OR
SIRIUS SYSTEM. I HAVE HAD MY AUTO SERVICED SIX SEPARATE TIMES AND STILL
HAVE ISSUES. AMONG THESE SIX VISITS, FOUR INVOLVED EITHER RECALLS OR "FULL
FLASH REPROGRAMS," IN ADDITION TO THE MAJOR SOFTWARE UPDATE WITH THE USB
FORD SENT OUT. CURRENTLY MY RADIO SUDDENLY SWITCHES BANDS, OR PRESETS
MALFUNCTION, AND MY RADIO WON'T TURN OFF WITHOUT A COMPLICATED SERIES OF
SCREEN ADJUSTMENTS. ALSO WHEN THIS HAPPENS MY MEMORY SEAT FUNCTION IS
DISABLED AND NO LONGER WORKS. I CONSIDER THESE PROBLEMS NOT MERELY
COSMETIC, BUT FUNCTIONAL SAFETY ISSUES SINCE THE SERVICE DEPARTMENT
CANNOT FIGURE OUT HOW THE RADIO/SYNC ISSUES AFFECT THE MEMORY SEAT
FUNCTION AND THUS COULD ULTIMATELY AFFECT A MORE CRITICAL AUTO FUNCTION
AND THESE OCCUR WHILE DRIVING WHICH HAS CAUSED ME MOMENTARY
DISORIENTATION. *TR

CLASS ACTION COMPLAINT

Date Complaint Filed: 08/24/2012

Component(s): ELECTRICAL SYSTEM

Date of Incident: 07/20/2011

NHTSA ID Number: 10472356

Vehicle Make: LINCOLN

Model: MKX

Year:

Crash: No      Fire: No        Number of Injuries: 0        Number of Deaths: 0

Manufacturer: Ford Motor Company

Vehicle Identification No. (VIN): 2LMDJ6JK1BB

SUMMARY: RADIO AND AC SETTINGS CHANGE EVERY TIME THE CAR IS RESTARTED. CAN NOT MAKE A CALL USING THE VOICE COMMAND SYSTEM. CALL WILL NOT ROUTE THROUGH THE CAR'S SPEAKERS. STEREO WILL NOT COME BACK ON AFTER A CALL. STEREO FREEZES UP AND SHOWS THAT IT IS ON SIRIUS, BUT IS REALLY ON AN FM STATION. STEREO STAYS ON WHEN THE CAR IS TURNED OFF AND DOOR IS OPENED. SYNC SCREEN BLANKS OUT AND STAYS OFF. PERFORMS "SYSTEM MAINTENANCE" FREQUENTLY. SAYS THAT THE NAVIGATION CARD IS FAULTY. BACK UP CAMERA DOES NOT COME ON, BUT SYSTEM SAYS IT IS FUNCTIONING. HAS BEEN TAKEN TO THE DEALERSHIP TWICE FOR REPAIRS. THEY HAVE PERFORMED A RESET BOTH TIMES WHICH TEMPORARILY RESTORES FUNCTION. WAS TOLD THAT NOTHING FURTHER COULD BE DONE UNLESS LINCOLN CAME OUT WITH AN UPDATE. *TR

1   Date Complaint Filed: 12/03/2012

2   Component(s): ELECTRICAL SYSTEM , EQUIPMENT

3   Date of Incident: 12/03/2012

4   NHTSA ID Number: 10487021

5
    Vehicle Make: FORD
6
7   Model: EXPLORER

8   Year: 2011

9   Crash: No      Fire: No        Number of Injuries: 0        Number of Deaths: 0

10  Manufacturer: Ford Motor Company

11  Vehicle Identification No. (VIN): Not Available

12
    SUMMARY: 2011 FORD EXPLORER. CONSUMER WRITES IN REGARDS TO SYNC
13  MALFUNCTION IN VEHICLE. *SMD THE CONSUMER STATED WHEN THE SYSTEM FAILED,
    THE SCREEN WENT BLACK AND THE RADIO AND TEMPERATURE CONTROL STOPPED
14  WORKING, AS WELL AS OTHER COMPONENTS. THE SYNC HAS BEEN WORKED ON BY
    THE DEALERSHIP 13 TIMES.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

Date Complaint Filed: 01/19/2013

Component(s): ELECTRICAL SYSTEM , EQUIPMENT

Date of Incident: 07/11/2012

NHTSA ID Number: 10493496

Vehicle Make: FORD

Model: ESCAPRE

Year: 2013

Crash: No     Fire: No        Number of Injuries: 0        Number of Deaths: 0

Manufacturer: Ford Motor Company

Vehicle Identification No. (VIN): 1FMC U9H 99

SUMMARY: THE MYFORDTOUCH SYSTEM WITH NAVIGATION IS UNSAFE. DUE TO
CONTINUOUS SOFTWARE AND HARDWARE ERRORS, THE LARGE VIDEO SCREEN IS
DISTRACTING TO THE DRIVER. PHONE DOES NOT SYNC FROM TIME TO TIME,
NAVIGATION DOES NOT ACQUIRE GPS SIGNAL OR VEHICLE POSITION IS INCORRECT.
MANY PROBLEMS WITH BLUETOOTH AND USB INTEGRATION, TOO MANY TO LIST HERE.
WHEN GLITCHES OCCUR, THE SCREEN OFTEN GOES COMPLETELY BLANK, SHOWING
NOTHING AT ALL. I HAVE HAD MY ESCAPE IN FOR SERVICE THREE TIMES FOR THESE
PROBLEMS. MY SPOUSE COMPLAINS WHEN SHE RIDES IN THE CAR THAT I AM
DISTRACTED BY CONTINUOUS ERRORS OF THE MFT DISPLAY. PROBLEMS WITH MFT
SYSTEM HAVE ALSO BEEN NOTED BY CONSUMER REPORTS. I WILL TAKE ADVANTAGE
OF THE LEMON LAW TO CORRECT THIS UNSAFE SITUATION WITH MY VEHICLE. *TR

### Ford Failed to Remedy the MyFord Touch/SYNC Defects

46.     On or around March 5, 2012, Ford offered an upgraded version of MyFord
Touch to current vehicle owners, which would be available for installation via USB
flash drive.  However, Plaintiff is informed and believes, and on that basis, alleges that
this upgrade failed to remedy the MyFord Touch/SYNC Defects.  After issuing this
upgrade, Ford continued to issue TSBs, application performance upgrades, and customer
satisfaction programs regarding MyFord Touch, reflecting that Ford had failed to
remedy the MyFord Touch/SYNC Defects.  After issuing this upgrade, consumers
continued to inform Ford of the ongoing MyFord Touch/SYNC Defects, by filing

24

complaints with the NHTSA, and upon information and belief, by complaining directly to Ford and Ford's dealerships.

47.     By way of example, Plaintiff is informed and believes, and on this basis, alleges that even when Ford performed its own survey of Class Vehicle owners who installed the upgrade, Ford reported that approximately 30% responded that they would not recommend MyFord Touch.

48.     Ford knew or should have known that the various remedies offered to consumers for the MyFord Touch/SYNC Defects would be ineffective.  In any event, Ford has failed to deliver MyFord Touch-equipped vehicles that conform to Ford's promises to provide navigation, audio, and phone features, among the other promised features described above.

**Ford's Representations Concerning
SYNC and MyFord Touch
Are Material to Consumers**

49.     At the time of making its representations concerning MyFord Touch, Ford knew or should have known that these representations are material to consumers. Plaintiff is informed and believes, and on that basis, alleges that Ford has made statements that MyFord Touch is an advanced technology drawing customers to the Ford brand, and that MyFord Touch and its underlying software, SYNC, were an important part of the purchasing decision for a majority of Ford's customers.

50.     Furthermore, in a June 17, 2013 press release, Ford boasted that "SYNC and MyFord Touch connectivity technologies . . . remain a competitive advantage as customers cite voice control and touch screens as top purchase drivers much more often than competitors."  Raj Nair, Ford's group vice president for global product development, stated in the same press release that "SYNC and MyFord Touch are key parts of our innovation strategy, and not only bring more new customers to our brand, but help deliver higher satisfaction with overall vehicle quality."  Ford clearly understands that representations concerning MyFord Touch are material to consumers

25

1   and influence their purchasing decisions.

2       51.    Plaintiffs and members of the Class relied upon Ford's representations and

3   nondisclosures concerning MyFord Touch in purchasing the Class Vehicles. Plaintiffs

4   and members of the Class would not have purchased the Class Vehicles, or would have

5   paid less for them, had Ford not made these representations and omissions concerning

6   MyFord Touch.

7   <strong>Plaintiffs Have Suffered Harm as a Result of<br>the MyFord Touch/SYNC Defects</strong>

8

9       52.    The MyFord Touch/SYNC Defects have, and will continue to, cost

10  Plaintiffs and members of the Class money in repair costs, and have resulted in extended

11  periods of time when Plaintiffs and members of the Class have been without their Class

12  Vehicles, or are deprived of the full use of the Class Vehicles.

13      53.    Ford's affirmative misrepresentations, and failure to disclose the MyFord

14  Touch/SYNC Defects, have allowed them to reap profits at the expense of the

15  consumers they have misled. Ford has been able to charge consumers a premium for the

16  MyFord Touch-equipped Class Vehicles, whereas Plaintiffs and members of the Class

17  have been deprived of the benefit of the bargain.

18      54.    The MyFord Touch/SYNC Defects have diminished the value of the Class

19  Vehicles. The Class Vehicles are worth less than Plaintiffs and members of the Class

20  paid for them.

21  <strong>PLAINTIFFS' CLAIMS AGAINST FORD</strong>

22  <strong>Plaintiff Megan Raney-Aarons</strong>

23      55.    Plaintiff Megan Raney-Aarons is a citizen of the State of California, and a

24  resident of Venice, California, which is in Los Angeles County, California.

25      56.    Plaintiff Raney-Aarons leased a 2012 Ford Edge from Santa Monica Ford,

26  located in Santa Monica, California on or around February 2012. She was initially

27  drawn to the Ford brand after observing and sitting in a model Ford vehicle being

28  promoted at an event in Mammoth Mountain, California, and admiring the advanced

26

1  MyTouch Ford features.   Plaintiff Raney-Aarons was particularly drawn to the

2  convenience and safety features that MyFord Touch promised, such as hands-free

3  telephone use and navigation.

4        57.   When Plaintiff Raney-Aarons leased her 2012 Ford Edge, she relied on a

5  reasonable expectation that her vehicle would possess a fully operational MyFord

6  Touch® system powered by SYNC.  She reviewed Ford's promotional materials and

7  advertisements concerning MyFord Touch® and SYNC, and had Ford disclosed that

8  MyFord Touch® and SYNC would not deliver the promised benefits, she would have

9  seen such disclosures and been aware of them.  Ford's representations concerning

10  MyFord Touch® and SYNC influenced her decision to lease her 2012 Ford Edge.

11        58.   Within approximately two weeks following her purchase of the 2012 Ford

12  Edge, Plaintiff Raney-Aarons began to experience numerous malfunctions with MyFord

13  Touch, including lack of phone connectivity, inoperable navigation system, rebooting of

14  MyFord Touch on a weekly basis, lack of audio connectivity, and a non-functioning

15  backup camera.

16        59.   On or around April 2012, Plaintiff Raney-Aarons took her vehicle to a Ford

17  dealership to have the MyFord Touch issues resolved.  She was told by the technician

18  that there was no inherent problem with MyFord Touch as a system overall, but that a

19  new card needed to be inserted into the system.  However, after replacement of this card,

20  the same problems persisted shortly thereafter.

21        60.   On or around June 2012, and again around November 2012, Plaintiff

22  Raney-Aarons again took her vehicle to a Ford dealership to have two separate updates

23  installed.  Again, after each instance, the problems continued to persist.  She also called

24  Ford's technical support hotline to seek resolution to these issues, and was told to take

25  her vehicle to a Ford dealership.

26        61.   Ford's material misstatements and omissions were material to Plaintiff

27  Raney-Aarons.  She would not have leased her 2012 Ford Edge, or she would not have

28  paid the lease price charged by Ford, had she known about the MyFord Touch/SYNC

27

1  Defects.  She continues to drive her Ford vehicle, but is unable to use any of the MyFord

2  Touch functions, including hands-free telephone use, navigation, or audio features.

3      62.    As discussed in detail in the preceding paragraphs, in connection with

4  Ford's extensive and long-term advertising campaign concerning MyFord Touch,

5  including communications made in television, print, outdoor, and other media, Plaintiff

6  was exposed to representations and omissions touting the benefits of MyFord Touch and

7  concealing its defects.  Plaintiff Raney-Aarons leased a 2012 Ford Edge as a result of the

8  aforementioned representations Ford made in its extensive and long-term advertising

9  campaign concerning the MyFord Touch system, and in reliance on those

10  representations, she leased her 2012 Ford Edge, believing that the MyFord Touch

11  system would perform as promised.  But for Ford's misrepresentations and omissions,

12  Plaintiff Raney-Aarons would not have leased her 2012 Ford Edge.

13     63.    Accordingly, Plaintiff Raney-Aarons has been monetarily damaged and

14  suffered injury in fact as a result of Ford's misconduct, because she has not received the

15  benefit of the bargain, and she paid a premium for her Class Vehicle equipped with

16  MyFord Touch that she would not have otherwise paid.

17                      **Plaintiff Richard Decker Watson**

18     64.    Plaintiff Richard Decker Watson is citizen of the State of California and a

19  resident of Los Angeles, California, in Los Angeles County, California.

20     65.    Plaintiff Richard Watson purchased a used 2011 Lincoln MKX from

21  Sunrise Ford, located in North Hollywood, California, on or around October 2012.

22     66.    When Plaintiff Watson purchased his used 2011 Lincoln MKX, he relied on

23  a reasonable expectation that his vehicle would possess a fully operational MyLincoln

24  Touch system powered by SYNC.  As discussed in detail in the preceding paragraphs, in

25  connection with Ford's extensive and long-term advertising campaign concerning

26  MyFord Touch, including communications made in television, print, outdoor, and other

27  media, Plaintiff Watson was exposed to representations and omissions touting the

28  benefits of MyFord Touch and concealing its defects.  Indeed, Plaintiff Watson

28

purchased a 2011 Lincoln MKX as a result of the aforementioned representations Ford made in its extensive and long-term advertising campaign concerning the MyFord Touch system, and in reliance on those representations, he purchased a 2011 Lincoln MKX, believing that the MyFord Touch system would perform as promised.  But for Ford's misrepresentations and omissions, Plaintiff Watons would not have purchased his 2011 Lincoln MKX.

67.    Additionally, Plaintiff Watson recalls seeing representations on Ford's website concerning the MyLincoln Touch features.  He reviewed Ford's promotional materials and advertisements concerning MyLincoln Touch® and SYNC, and had Ford disclosed that MyLincoln Touch® and SYNC would not deliver the promised benefits, he would have seen such disclosures and been aware of them.  Ford's representations concerning MyLincoln Touch® and SYNC influenced his decision to purchase his 2011 Lincoln MKX.

68.    Plaintiff Watson immediately noticed defects with MyLincoln Touch, including incorrect directions given by the malfunctioning navigation system, malfunctioning audio system, the touch screen freezing, and long resets of the system.  To remedy the issues, Plaintiff Watson searched on the Ford website for self-help instructions.  After following the instructions, MyLincoln Touch continued to malfunction.  He also contacted Ford representatives over the phone, who instructed him to take his vehicle to a dealership for service.

69.    To diagnose and remedy the problems with MyLincoln Touch, Plaintiff Watson took his vehicle to the Sunrise Ford dealership within one week following his purchase of the vehicle.  He later took his vehicle on two occasions to Star Ford Lincoln in Glendale, California, and once to Galpin Lincoln in Van Nuys, California.  None of these visits remedied the problems with his MyLincoln Touch system, and the problems persisted.

70.    Plaintiff Watson continues to drive and possess his 2011 Lincoln MKX, but cannot utilize the functions Ford promised would be available with MyFord Touch.

29

1  Additionally, Plaintiff Watson pays an annual fee to subscribe to Ford's Sync Services
2  so that he can use the Operator Assist feature in his 2011 Lincoln MKX, but as a result
3  of the MyFord Touch/SYNC Defects, Plaintiff Watson has not been able to fully utilize
4  this feature, and Ford has not refunded him the cost of his subscription.

5      71.    Ford's material misstatements and omissions were material to Plaintiff
6  Watson.  He would not have purchased his 2011 Lincoln MKX, or he would not have
7  paid the purchase price charged by Ford, had he known about the MyFord Touch/SYNC
8  Defects.  Accordingly, Plaintiff Watson has been monetarily damaged and suffered
9  injury in fact as a result of Ford's misconduct, because he has not received the benefit of
10  the bargain.

11                        **STATUTE OF LIMITATIONS**

12      72.    Upon information and belief, Ford has known of the true nature of the Class
13  Vehicles, and of the MyFord Touch/SYNC Defects, since shortly after Ford's launch of
14  MyFord Touch in 2010, if not earlier, and has concealed from or failed to notify
15  Plaintiffs, Class Members and the public of the full and complete nature of the MyFord
16  Touch/SYNC Defects.

17      73.    Any applicable statutes of limitations have therefore been tolled by Ford's
18  knowing and active concealment, denial, and misleading actions, as alleged herein.
19  Plaintiffs and members of the Class defined below were kept ignorant of critical
20  information required for the prosecution of their claims, without any fault or lack of
21  diligence on their part.  Plaintiffs and members of the Class could not reasonably have
22  discovered the true latent nature of the SYNC defects or any of the issues and facts
23  alleged herein, until shortly before this class action litigation commenced.

24      74.    Ford is and was under a continuous duty to disclose to Plaintiffs and
25  members of the Class the true character, quality and nature of the Class Vehicles, and to
26  disclose the existence of the material MyFord Touch/SYNC Defects.  Ford knowingly,
27  affirmatively and actively concealed the true character, quality and nature of the Class
28  Vehicles, and the existence of the MyFord Touch/SYNC Defects.  In purchasing the

30

1    Class Vehicles, Plaintiffs and members of the Class reasonably relied upon Ford's

2    knowing, affirmative misrepresentations and active concealment. Based on the

3    foregoing, Ford is estopped from relying on any statutes of limitation as a defense in this

4    action.

5        75.    The causes of action alleged herein did or will only accrue upon discovery

6    of the latent MyFord Touch/SYNC Defects, as a result of Ford's fraudulent concealment

7    of the MyFord Touch/SYNC Defects. Plaintiffs and members of the Class did not

8    discover, and could not have discovered, through the exercise of reasonable diligence,

9    the true nature of the Class Vehicles and MyFord Touch/SYNC Defects.

10                          **CLASS ACTION ALLEGATIONS**

11       76.    Plaintiffs bring this action, on behalf of themselves and all others similarly

12   situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

13       77.    The classes Plaintiffs seek to represent (collectively, the "Class") are

14   defined as follows:

15              NATIONWIDE CLASS: All persons and entities in the United States
                (including its Territories and the District of Columbia) who are
16              current or former owners and/or lessees of a Class Vehicle (defined as
                a Ford, Lincoln and/or Mercury vehicle equipped with MyFord
17              Touch, MyLincoln Touch or MyMercury Touch).
18
19              CALIFORNIA SUBCLASS: All members of the Nationwide Class
                who purchased or leased a Class Vehicle in California.
20

21       78.    Plaintiffs reserve the right to amend the Class definitions if discovery and

22   further investigation reveal that the classes should be expanded or otherwise modified.

23       79.    Plaintiffs reserve the right to establish subclasses where appropriate.

24       80.    This action is brought and properly may be maintained as a class action

25   pursuant to the provisions of the Federal Rules of Civil Procedure 23(a)(1)-(4) and

26   23(b)(1), (b)(2) or (b)(3) and satisfies the requirements thereof.

27       81.    <u>Numerosity</u>: While the exact number of members of the Class is unknown

28

1  to Plaintiffs at this time and can only be determined by appropriate discovery,

2  membership in the Class is ascertainable based upon the records maintained by Ford.  At

3  this time, Plaintiffs are informed and believe that the Class includes thousands of

4  members.  Therefore, the Class is sufficiently numerous that joinder of all members of

5  the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule

6  23(a)(1), and the resolution of their claims through the procedure of a class action will

7  be of benefit to the parties and the Court.

8          82.    Ascertainability:  Names and addresses of members of the Class are

9  available from Ford's records.  Notice can be provided to the members of the Class

10  through direct mailing, publication, or otherwise using techniques and a form of notice

11  similar to those customarily used in consumer class actions arising under California state

12  law and federal law.

13          83.    Typicality:  Plaintiffs' claims are typical of the claims of other members of

14  the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3)

15  because Plaintiffs and each member of the Class have been subjected to the same

16  deceptive and improper practices and have been damaged in the same manner thereby.

17          84.    Adequacy:  Plaintiffs will fairly and adequately represent and protect the

18  interests of the Class as required by Federal Rule of Civil Procedure 23(a)(4).  Plaintiffs

19  are adequate representatives of the Class, because they have no interests which are

20  adverse to the interests of the members of the Class.  Plaintiffs are committed to the

21  vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who

22  are competent and experienced in handling class action litigation on behalf of

23  consumers.

24          85.    Superiority:  A class action is superior to all other available methods of the

25  fair and efficient adjudication of the claims asserted in this action under Federal Rule of

26  Civil Procedure 23(b)(3) because:

27                  (a)    The expense and burden of individual litigation make it economically

28                          unfeasible for members of the Class to seek to redress their "negative

32

value" claims other than through the procedure of a class action.

(b)   If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their "negative value" claims other than through the procedure of a class action; and

(c)   Absent a class action, Ford likely would retain the benefits of its wrongdoing, and there would be a failure of justice.

86.   Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

87.   The common questions of fact include, but are not limited to, the following:

(a)   Whether the Class Vehicles indeed suffer from the MyFord Touch/SYNC Defects;

(b)   Whether Ford knew or should have known about the MyFord Touch/SYNC Defects, and if so, how long Ford has known or should have known of the MyFord Touch/SYNC Defects;

(c)   Whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Class Vehicle;

(d)   Whether Ford had a duty to disclose the MyFord Touch/SYNC Defects to consumers;

(e)    Whether Ford breached its duty to disclose the MyFord Touch/SYNC Defects to consumers;

(f)   Whether Ford actively concealed material facts from Plaintiffs and members of the Class;

(g)   Whether Ford's concealment of the true defective nature of the Class Vehicles induces Plaintiffs and Class Members to act to their detriment

33

1   by purchasing Class Vehicles;

2   (h)   Whether Ford's conduct, as alleged herein, was unlawful, unfair, or

3   fraudulent under the California's Unfair Competition Law, California

4   Business & Professions Code sections 17200 *et seq.*;

5   (i)   Whether Ford's conduct, as alleged herein, violated California's

6   Consumers Legal Remedies Act, California Civil Code sections 1750

7   *et seq.*;

8   (j)   Whether Ford's conduct, as alleged herein, violated California's False

9   Advertising Law, California Business and Professions Code sections

10   17500 *et seq.*;

11   (k)   Whether Ford's conduct, as alleged herein, constituted a breach of

12   express warranty under common law;

13   (l)   Whether Ford's conduct, as alleged herein, constituted a breach of

14   express warranty under the Magnuson-Moss Warranty Act, 15 U.S.C.

15   section 2301 *et seq.*;

16   (m)   Whether Ford's conduct, as alleged herein, constituted a breach of

17   implied warranty of fitness for particular purpose under common law;

18   (n)   Whether Ford's conduct, as alleged herein, constituted a breach of

19   implied warranty of merchantability under common law;

20   (o)   Whether Ford's conduct, as alleged herein, constituted negligent

21   misrepresentation under common law;

22   (p)   Whether Ford was unjustly enriched at the expense of the Class; and

23   (q)   Whether Plaintiffs and members of the Class are entitled to restitution

24   and damages.

25   88.   In the alternative, this action is certifiable under the provisions of Federal

26   Rule of Civil Procedure 23(b)(1) and/or (b)(2) because:

27   (a)   The prosecution of separate actions by individual members of the

28   Class would create a risk of inconsistent or varying adjudications with

34

1    respect to individual members of the Class which would establish

2    incompatible standards of conduct for Ford;

3        (b)    The prosecution of separate actions by individual members of the

4               Class would create a risk of adjudications as to them which would, as a

5               practical matter, be dispositive of the interests of the other members of

6               the Class not parties to the adjudications, or substantially impair or

7               impede their ability to protect their interests; and

8        (c)    Ford has acted or refused to act on grounds generally applicable to the

9               Class, thereby making appropriate final injunctive relief or

10              corresponding declaratory relief with respect to the Class as a whole

11              and necessitating that any such relief be extended to members of the

12              Class on a mandatory, class-wide basis.

13   89.    Plaintiffs are not aware of any difficulty which will be encountered in the

14   management of this litigation which should preclude its maintenance as a class action.

## FIRST CAUSE OF ACTION
### Brought on behalf of the California Subclass
### Violation of the Consumers Legal Remedies Act
### (Cal. Civil Code § 1750 *et seq.*)

18   90.    Plaintiffs hereby incorporate by reference the allegations contained in the

19   preceding paragraphs of this Complaint.

20   91.    Plaintiffs bring this cause of action on behalf of themselves and the other

21   members of the California Subclass.

22   92.    This cause of action is brought under the Consumers Legal Remedies Act,

23   California Civil Code sections 1750 *et seq.* ("CLRA"). Plaintiffs and members of the

24   California Subclass are consumers as defined by California Civil Code section 1761(d).

25   The Class Vehicles are goods within the meaning of California Civil Code

26   section 1761(a).

27   93.    Ford violated and continues to violate the CLRA by engaging in the

28   following practices proscribed by California Civil Code section 1770(a) in transactions

35

with Plaintiffs and members of the California Subclass, which were intended to result in, and did result in, the sale of the Class Vehicles:

> (5)     Representing that [the Class Vehicles have]... characteristics...[and] uses...which they do not have....
>
> (7)     Representing that [the Class Vehicles] are of a particular standard...if they are of another.
>
> (9)     Advertising [the Class Vehicles]...with intent not to sell them as advertised.
>
> (16)   Representing that [the Class Vehicles] have been supplied in accordance with a previous representation when they have not.

94.     Ford violated the CLRA by representing and advertising that the Class Vehicles, as discussed above, would be equipped with an operational MyFord Touch system that provided navigation, audio, and phone features, among other promised features described above.   However, Ford knew, or should have known, that its representations concerning MyFord Touch were false and misleading.

95.      Ford further violated the CLRA by failing to disclose, at any point, to Plaintiffs and members of the Class that the Class Vehicles suffered from the MyFord Touch/SYNC Defects.

96.     Ford further violated the CLRA by actively concealing material facts from Plaintiffs and members of the California Subclass.  Although Ford knew or should have known about the MyFord Touch/SYNC Defects, Ford actively concealed this information by, among other things, issuing "upgrades" to MyFord Touch that Ford knew would be ineffective, continuing to issue press releases touting the benefits of MyFord Touch, and continuing to advertise the purported benefits of MyFord Touch.

97.     Ford also violated the CLRA because its failure to disclose the MyFord Touch/SYNC Defects risked the safety of owners and occupants of the Class Vehicles. Inability to operate defrosting and heating operations, sudden malfunctioning of cruise control, and the distracting nature of the MyFord Touch/SYNC Defects risk the safety of drivers and occupants of the Class Vehicles.

98.     Ford's misrepresentations and omissions were material to Plaintiffs and members of the California Subclass.  Plaintiffs and members of the California Subclass are reasonable consumers who expected that the Class Vehicles would be equipped with operational MyFord Touch, and did not expect that their Class Vehicles will contain the MyFord Touch/SYNC Defects.  Reasonable consumers would have considered such misrepresentations and omissions important in deciding whether or not to purchase a Class Vehicle.

99.     Because of its violations of the CLRA described above, Ford has caused and continues to cause injury in fact and actual damage to Plaintiffs and members of the California Subclass, and if not stopped, will continue to harm them.  Plaintiffs and members of the California Subclass would not have purchased the Class Vehicles, or would have paid less for them, had it not been for Ford's misrepresentations and concealment of material facts.  Plaintiffs and members of the California Subclass have suffered injury in fact and actual damages because they paid more for the Class Vehicles than they would have had Ford not misrepresented that the Class Vehicles were equipped with functional MyFord Touch systems, or had Ford disclosed the MyFord Touch/SYNC Defects to Plaintiffs and members of the California Subclass.  Thus, Plaintiffs and members of the California Subclass lost money or property as a proximate result of Ford's affirmative misrepresentations and omissions.  Plaintiffs and members of the California Subclass have furthermore been exposed to a safety risk.

100.    Under Civil Code § 1780(a), Plaintiffs and members of the California Subclass seek injunctive and equitable relief for Ford's violations of the CLRA.  After mailing appropriate notice and demand under Civil Code § 1782(a) and (d), Plaintiffs will subsequently amend this Complaint to also include a request for damages.  Plaintiffs and members of the California Subclass request this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired with such unfair business practices, and for such other relief, including attorneys'' fees and costs, as provided in Civil Code § 1780 and the Prayer for Relief.

## SECOND CAUSE OF ACTION
### Brought on behalf of the California Subclass
### Violation of Unfair Competition Law
### (California Business & Professions Code §§ 17200 *et seq.*)

101.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

102.   Plaintiffs bring this cause of action on behalf of themselves and the other members of the California Subclass.

103.   California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." For the reasons described above, Ford has engaged in unlawful, unfair, and/or fraudulent business acts or practices in violation of California Business and Professions Code section 17200.

104.   Ford's misrepresentations and omissions of material facts, as set forth herein, constitute an unlawful practice because they violate California Civil Code sections 1572, 1573, 1709, 1710, 1711, 1770, California Business and Professions Code sections 17200 *et seq.*, California Commercial Code section 2313, the federal Magnuson-Moss Warranty Act (15 U.S.C. § 2301 *et seq.*), and the common law.

105.   Ford's affirmative misrepresentations and omissions of material facts, as set forth herein, also constitute "unfair" business acts and practices within the meaning of California Business and Professions Code sections 17200 *et seq.*, in that Ford's conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous. Plaintiffs also assert a violation of public policy based upon Ford's withholding material facts from consumers. Ford's violation of consumer protection and unfair competition laws in California resulted in harm to consumers.

106.   There were reasonable alternatives available to Ford to further Ford's legitimate business interests, other than the conduct described herein.

107.   California Business and Professions Code section 17200 also prohibits any "fraudulent business act or practice."

38

108.   Ford's misrepresentations and concealment of material facts, as set forth above, were false, misleading, and/or likely to deceive the public within the meaning of California Business and Professions Code section 17200.

109.   Ford's acts of misrepresentations and concealment were made with knowledge of their effect, and were done to induce Plaintiffs and members of the California Subclass to purchase the Class Vehicles.  Plaintiffs and members of the California Subclass saw and justifiably relied on Ford's affirmative misrepresentations and active concealment when they purchased the Class Vehicles.

110.   As a result of Ford's affirmative misrepresentations and failure to disclose, Plaintiffs and members of the California Subclass have suffered injury in fact and actual damages because they paid more for the Class Vehicles than they would have had Ford not misrepresented that the Class Vehicles were equipped with functional MyFord Touch systems, or had Ford disclosed the MyFord Touch/SYNC Defects to Plaintiffs and members of the California Subclass.  Thus, Plaintiffs and members of the California Subclass lost money or property as a result of Ford's affirmative misrepresentations and omissions.  Plaintiffs and members of the Class have furthermore been exposed to a safety risk.

111. The facts that the Class Vehicles did not possess operational MyFord Touch systems, and suffered from the SYNC defects, are material.   Plaintiffs and members of the California Subclass are reasonable consumers who expected that the Class Vehicles would be equipped with operational MyFord Touch systems, and did not expect that their Class Vehicles will contain the MyFord Touch/SYNC Defects.  Reasonable consumers would have considered such misrepresentations and omissions important in deciding whether or not to purchase a Class Vehicle.

112.   Additionally, the fact that the Class Vehicles suffer from the MyFord Touch/SYNC Defects is material because this presents a safety issue and places the driver and passengers at risk of serious harm.  Inability to operate defrosting and heating operations, sudden malfunctioning of cruise control, and the distracting nature of the

1  SYNC defects risk the safety of drivers and occupants of the Class Vehicles.

2      113.   Plaintiffs and members of the California Subclass would not have

3  purchased the Class Vehicles, or would have paid less for them, had it not been for

4  Ford's affirmative misrepresentations and concealment of material facts.

5      114.   Ford has thus engaged in unlawful, unfair, and fraudulent business acts

6  entitling Plaintiffs and members of the California Subclass to judgment and equitable

7  relief against Ford, as set forth in the Prayer for Relief.

8      115.   Additionally, under Business and Professions Code section 17203, Plaintiffs

9  and members of the California Subclass seek an order requiring Ford to immediately

10 cease such acts of unlawful, unfair, and fraudulent business practices and requiring Ford

11 to correct its actions.

### THIRD CAUSE OF ACTION
**Brought on behalf of the California Subclass**
**Violation of the California False Advertising Law**
**(Cal. Bus. & Prof. Code § 17500, *et seq.*)**

15     116.   Plaintiffs incorporate by reference the allegations contained in the

16 preceding paragraphs of this Complaint.

17     117.   California Business and Professions Code section 17500 states: "It is

18 unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real

19 or personal property . . . to induce the public to enter into any obligation relating thereto,

20 to make or disseminate or cause to be made or disseminated . . . from this state before

21 the public in any state, in any newspaper or other publication, or any advertising device .

22 . . or in any other manner or means whatever, including over the Internet, any statement .

23 . . which is untrue or misleading, and which is known, or which by the exercise of

24 reasonable care should be known, to be untrue or misleading."

25     118.   Ford caused to be made or disseminated through California and the United

26 States, through advertising, statements that were untrue or misleading, and which were

27 known, or which by exercising reasonable care should have been known to Ford, to be

28 untrue and misleading to consumers and Plaintiffs.  Specifically, Ford affirmatively

misrepresented that MyFord Touch would provide navigation, audio, and phone features, among other promised features described above, and concealed the MyFord Touch/SYNC Defects from consumers.

119.   Defendants have violated section 17500 because the misrepresentations and omissions regarding the Class Vehicles and MyFord Touch, as set forth above, were material and likely to deceive reasonable consumers.

120.   As a result of Ford's affirmative misrepresentations and failure to disclose, Plaintiffs and members of the California Subclass have suffered injury in fact and actual damages because they paid more for the Class Vehicles than they would have had Ford not misrepresented that the Class Vehicles were equipped with functional MyFord Touch systems, or had Ford disclosed the MyFord Touch/SYNC Defects to Plaintiffs and members of the California Subclass.  Thus, Plaintiffs and members of the California Subclass lost money or property as a result of Ford's affirmative misrepresentations and omissions.

121.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business.  Ford's wrongful conduct is part of a pattern or generalized conduct that is still perpetuated and repeated, both in California and nationwide.

122.   Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing their false advertising and to restore to Plaintiffs and members of the California Subclass any money that Ford acquired by unfair competition and false advertising, and for such relief as set forth below.

### FOURTH CAUSE OF ACTION
### Brought on behalf of the Nationwide Class
### Breach of Implied Warranty of Fitness for a Particular Purpose

123.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

124.   Ford was at all relevant times the manufacturer, distributor, warrantor or

41

1  seller of the Class Vehicles.  At the time of contracting, Ford knew or had reason to
2  know of the specific use for which the Class Vehicles equipped with MyFord Touch
3  were purchased – that is, to provide navigation, audio, and phone features, among other
4  promised features described above.

5      125.   Plaintiffs and members of the Nationwide Class relied on Ford's skill
6  and/or judgement in purchasing the Class Vehicles.   Thus, Ford created an implied
7  warranty that the Class Vehicles would be suitable for the purpose of providing the
8  promised MyFord Touch features.

9      126.   However, as alleged above, MyFord Touch was and is not fit for these
10  purposes, in that the Class Vehicles suffer from the MyFord Touch/SYNC Defects, and
11  do not contain functional MyFord Touch systems.  Thus, Plaintiffs and members of the
12  Nationwide Class were injured by Ford's conduct in breaching the implied warranty of
13  fitness for a particular purpose.

### FIFTH CAUSE OF ACTION
14
#### Brought on behalf of the Nationwide Class
15
#### Breach of Implied Warranty of Merchantability

16      127.   Plaintiff hereby incorporates by reference the allegations contained in the
17  preceding paragraphs of this Complaint.

18      128.   Ford is and was at all relevant times the manufacturer, distributor,
19  warrantor, and/or seller of the Class Vehicles.

20      129.   Ford provided Plaintiffs and members of the Nationwide Class with an
21  implied warranty that the Class Vehicles , and any parts thereof, are merchantable and fit
22  for the ordinary purposes for which they are sold.  However, MyFord Touch is not fit for
23  its ordinary purpose – that is, to provide navigation, audio, and phone features, among
24  other promised features described above.  Due to the MyFord Touch/SYNC Defects,
25  Plaintiffs and members of the Nationwide Class are precluded from using these
26  functions that Ford promised would be available.

27      130.   Ford was provided notice of the MyFord Touch/SYNC Defects through
28

1  numerous complaints filed against it, as well as internal knowledge derived from its own
2  testing and internal analyses.

3      131.   Plaintiffs and other members of the Nationwide Class have had sufficient
4  dealings with Ford or its agents (dealerships, technical support) to establish privity of
5  contract between Ford, on the one hand, and Plaintiffs and each of the Nationwide Class
6  members on the other hand.  Nonetheless, privity is not required here because Plaintiff
7  and each of the other Nationwide Class members are intended third-party beneficiaries
8  of contracts between Ford and its dealers and, specifically, of Ford's implies warranties.
9  The dealers were not intended to be the ultimate consumers of the Class Vehicles and
10  have no rights under the warranty agreements provided with the Class Vehicles; the
11  warranty agreements were designed for and intended to benefit the consumers only.

12      132.   As a direct and proximate result of Ford's breach of the implied warranty
13  of merchantability, Plaintiffs and members of the Nationwide Class have lost money or
14  property, and have thereby been damaged in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**Brought on behalf of the Nationwide Class**
**Breach of Express Warranty**

17      133.   Plaintiff hereby incorporates by reference the allegations contained in the
18  preceding paragraphs of this Complaint.

19      134.   Plaintiffs, and each member of the Nationwide Class, formed a contract
20  with Ford at the time that they purchased the Class Vehicles.  The terms of that contract
21  included the promises and affirmations of fact that each of the Class Vehicles would be
22  equipped with an operational MyFord Touch system that provided navigation, audio,
23  and phone features, among other promised features described above.  Ford also
24  expressly warranted that it would repair and/or replace defects in material or
25  workmanship free of charge that occurred during the applicable warranty periods.  This
26  became part of the basis of the bargain, and is part of a standardized contract between
27  Plaintiffs and members of the Nationwide Class on the one hand, and Ford on the other.

43

1      135.   All conditions precedent to Ford's liability under this express warranty have

2 been performed by Plaintiffs and the Nationwide Class.

3      136.   Ford breached its express warranty to Plaintiffs and members of the

4 Nationwide Class by selling them Class Vehicles that were not equipped with an

5 operational MyFord Touch system that provided navigation, audio, and phone features,

6 among other promised features described above, and rather, by providing them Class

7 Vehicles suffering from the MyFord Touch/SYNC Defects. Ford furthermore breached

8 its express warranty to repair and/or replace defects by failing to properly repair and/or

9 replace the defective MyFord Touch products.

10     137.   As a result of Ford's breach of express warranty, Plaintiffs and members of

11 the Nationwide Class have suffered damages including the amount they paid for repairs

12 to the Class Vehicles, loss of vehicle and use of MyFord Touch, loss in value and resale

13 value of the Class Vehicles, and other related damage.

14                        **SEVENTH CAUSE OF ACTION**

             **Brought on behalf of the Nationwide Class**

15             **Violation of Magnuson-Moss Warranty Act**

16                    **(15 U.S.C. § 2301)**

17     138.   Plaintiffs hereby incorporate by reference all allegations contained in the

18 preceding paragraphs of this Complaint.

19     139.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss

20 Warranty Act, 15 U.S.C. § 2301(3).

21     140.   Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-

22 Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

23     141.   The Class Vehicles are "consumer products" within the meaning of the

24 Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

25     142.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is

26 damaged by the failure of a warrantor to comply with a written or implied warranty.

27     143.   Ford's express warranties are written warranties within the meaning of the

28 Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied

1   warranties are covered under 15 U.S.C. § 2301(7).

2      144.   Ford breached these warranties by, among other actions, 1) selling Class

3   Vehicles that were not equipped with operational MyFord Touch systems that provided

4   navigation, audio, and phone features, among other expressly promised features

5   described above, and rather, by providing them Class Vehicles suffering from the

6   MyFord Touch/SYNC Defects; 2) failing to properly repair and/or replace the defective

7   MyFord Touch products, as Ford expressly warranted to the Nationwide Class.

8      145.   Plaintiffs and other members of the Nationwide Class have had sufficient

9   direct dealings with either Ford or its agents (dealerships and technical support) to

10  establish privity of contract between Ford, on the one hand, and Plaintiffs and members

11  of the Nationwide Class, on the other hand.  Nonetheless, privity is not required here

12  because Plaintiff and members of the Nationwide Class are intended third-party

13  beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's

14  implied warranties.  The dealers were not intended to be the ultimate consumers of the

15  Class Vehicles and have no rights under the warranty agreements provided with the

16  Class Vehicles; the warranty agreements were designed for and intended to benefit the

17  consumers only.

18     146.   Affording Ford a reasonable opportunity to cure its breach of written

19  warranties would be unnecessary and futile here.  Indeed, Plaintiffs and members of the

20  Nationwide Class have already done so, and Ford has failed, after numerous attempts, to

21  cure the defects.  At the time or sale or lease of the Class Vehicles, Ford knew, or should

22  have known that MyFord Touch could not perform as warranted, but nonetheless failed

23  to rectify the situation or disclose the MyFord Touch/SYNC Defects to consumers.

24  Under the circumstances, the remedies available under any informal settlement

25  procedure would be inadequate and any requirement that Plaintiffs resort to an informal

26  dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its

27  breach of warranties is excused and therefore deemed satisfied.

28     147.   Plaintiffs and other members of the Nationwide Class would suffer

45

1    economic hardship if they returned their Class Vehicles but did not receive the return of

2    all payments made by them.  Because, upon information and belief, Ford refuses to

3    acknowledge any revocation of acceptance and return immediately any payments made,

4    Plaintiffs and other members of the Nationwide Class have not re-accepted their Class

5    Vehicles by retaining them.

6        148.   The amount in controversy of Plaintiffs' individual claims meets or exceeds

7    the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000,

8    exclusive of interest and costs, computed on the basis of all claims to be determined in

9    this lawsuit.

10       149.   Plaintiffs, individually and on behalf of the other members of the

11    Nationwide Class, seeks all damages permitted by law, including diminution in value of

12    the Class Vehicles.

**EIGHTH CAUSE OF ACTION**
**Brought on behalf of the Nationwide Class**
**Negligent Misrepresentation**

150.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

151.   Ford misrepresented that the Class Vehicles were equipped with an operational SYNC system that provided navigation, audio, and phone features, among other promised features described above, and did not disclose that the Class Vehicles suffer from the MyFord Touch/SYNC Defects.

152.   Ford had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and members of the Nationwide Class rely on these representations.

153.   Plaintiffs and members of the Nationwide Class relied upon these false representations, concealments and nondisclosures by Ford when purchasing the Class Vehicles, which reliance was justified.

154.   As a result of Ford's wrongful conduct, Plaintiffs and members of the

46

1   Nationwide Class have suffered and continue to suffer economic losses and other

2   general and specific damages, including but not limited to the amounts paid for the Class

3   Vehicles, and any interest that would have accrued, in an amount to be determined

4   according to proof at time of trial.

### NINTH CAUSE OF ACTION
### Brought on behalf of the Nationwide Class
### Unjust Enrichment

155.   Plaintiffs hereby incorporate by reference the allegations contained in the
preceding paragraphs of this Complaint.

156.   By its wrongful acts and omissions described herein, Ford was unjustly
enriched at the expense of Plaintiffs and members of the Nationwide Class, who did not
receive the goods to which they were entitled – namely, Class Vehicles equipped with
operational MyFord Touch systems that provided navigation, audio, and phone features,
among other promised features described above – for the payments made to Ford, and
thus Plaintiffs and members of the Nationwide Class were unjustly deprived.

157.   The circumstances as described herein are such that it would be inequitable
for Ford to retain these ill-gotten benefits and profits without paying the value thereof to
Plaintiffs and the Nationwide Class.

158.   Plaintiff and members of the Nationwide Class are entitled to restitution of
the amount of Ford's ill-gotten gains, benefits and profits, including interest, resulting
from their unlawful, unjust and inequitable conduct, as described above.

159.   Accordingly, Plaintiffs and members of the Nationwide Class seek an order
disgorging all profits, benefits, and other compensation obtained by Ford from its
wrongful conduct.

### PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of themselves and all others similarly
situated, requests the Court enter judgment against Ford, as follows:

1.      Certifying the Class as requested herein;

47

1      2.      Ordering that Ford is financially responsible for notifying all members of the

2  Class of the alleged omissions and active concealment of material facts discussed herein;

3      3.      Awarding Plaintiffs and the members of the Class compensatory damages in

4  an amount according to proof at trial;

5      4.      Awarding restitution and disgorgement of Ford's revenues to Plaintiffs and

6  members of the Class;

7      5.      Awarding declaratory and injunctive relief as permitted by law or equity,

8  including: enjoining Ford from continuing the unlawful practices as set forth herein, and

9  directing Ford to identify, with Court supervision, victims of its conduct and pay them

10  restitution and disgorgement of all monies acquired by Ford by means of any act or

11  practice declared by this Court to be wrongful;

12      6.      Awarding to Plaintiffs and the Class punitive damages;

13      7.      Ordering Ford to engage in corrective advertising;

14      8.      Awarding interest on the monies wrongfully obtained from the date of

15  collection through the date of entry of judgment in this action;

16      9.      Awarding attorneys' fees, expenses, and recoverable costs reasonably

17  incurred in connection with the commencement and prosecution of this action; and

18      10.    For such other and further relief as the Court deems just and proper.

19

20  Dated: July **18**, 2013              BARON & BUDD, P.C.

21

22                                By: _____

23                                 Mark P. Pifko

24                         Attorneys for Plaintiffs

25                         MEGAN RANEY-AARONS and
                               RICHARD DECKER WATSON ,

26                         individually, and on behalf of other
                               members of the public similarly situated

27

28

1                   **DEMAND FOR JURY TRIAL**

2       Plaintiffs request trial by jury on all issues so triable.

3                                    Respectfully submitted,

4

5   Dated:  July 18, 2013            BARON & BUDD, P.C.

6

7                          By:
                            Mark P. Pifko

8                         Attorneys for Plaintiffs

9                         MEGAN RANEY-AARONS and
                        RICHARD DECKER WATSON ,

10                         individually, and on behalf of other
                        members of the public similarly situated

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Audrey B. Collins and the assigned discovery Magistrate Judge is Margaret A. Nagle.

The case number on all documents filed with the Court should read as follows:

## CV13- 5243 ABC  (MANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Central District of California

| | | |
|---|---|---|
| RICHARD DECKER WATSON, and MEGAN RANEY-AARONS, individually, and on behalf of other members of the public similarly situated | ) ) ) ) | |
| *Plaintiff(s)* | ) ) ) | Civil Action No. |
| v. | ) ) ) | CV13-05243-ABC(MMNx) |
| FORD MOTOR COMPANY, a Delaware Corporation | ) ) ) | |
| *Defendant(s)* | ) ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  FORD MOTOR COMPANY, a Delaware Corporation
1 American Road
P.O. Box 6248
Dearborn, Michigan 48126-2798

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

JUL 1 9 2013

Date: _____

ANDRES PEDRO

*Signature of Clerk or Deputy Clerk*

1202

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* ......................................................................................

was received by me on *(date)* _____ .

    ☐ I personally served the summons on the individual at *(place)* ............................................................

_____ on *(date)* _____ ; or

    ☐ I left the summons at the individual's residence or usual place of abode with *(name)* ..............................

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ☐ I served the summons on *(name of individual)* ........................................................ , who is

designated by law to accept service of process on behalf of *(name of organization)* ..............................

_____ on *(date)* _____ ; or

    ☐ I returned the summons unexecuted because .......................................................................... ; or

    ☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

                            _____
                                    *Server's signature*

                            _____
                                   *Printed name and title*

                            _____
                                   *Server's address*

Additional information regarding attempted service, etc:

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

RICHARD DECKER WATSON, and MEGAN RANEY-AARONS, individually, and on behalf of other members of the public similarly situated

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Roland Tellis (SBN 186269); Mark Pifko (SBN 228412); Natasha Mehta (SBN 272241)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600, Encino, CA 91436
Ph.: 818.839.2333 / Fax: 818.986.9698

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

---

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No   ☒ MONEY DEMANDED IN COMPLAINT: $ Exceed $5,000,000.00

---

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Class Action Fairness Act of 2005, 28 U.S.C. section 1332(d); Class action complaint for fraud and injunctive relief under UCL and damages under CLRA

---

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **TORTS** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | **PERSONAL INJURY** | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 310 Airplane | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 315 Airplane Product Liability | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 320 Assault, Libel & Slander | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 330 Fed. Employers' Liability | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☒ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 340 Marine | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 345 Marine Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 350 Motor Vehicle | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 355 Motor Vehicle Product Liability | ☐ 440 Other Civil Rights | | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 360 Other Personal Injury | ☐ 441 Voting | **LABOR** | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 710 Fair Labor Standards Act | |
| | ☐ 220 Foreclosure | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/ Accomodations | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 740 Railway Labor Act | |
| | | ☐ 368 Asbestos Personal Injury | ☐ 446 American with Disabilities-Other | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 448 Education | ☐ 790 Other Labor Litigation | |
| | | | | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number:   CV13-05243

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   ☐ NO   ☒ YES

If yes, list case number(s):   CV13-5068-PSG

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Michigan |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____   DATE:   July 19, 2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |